# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

CRIMINAL ACTION NO. 5:19-CR-00206-KKC

UNITED STATES OF AMERICA                           PLAINTIFF

V.        **UNITED STATES' SENTENCING POSITION REGARDING DEFENDANT CLINTON PORTIS**

CLINTON PORTIS                                      DEFENDANT

*************

The United States of America, through counsel, submits its position with respect to the appropriate sentence for Defendant Clinton Portis ("Portis"). The United States concurs with the Probation Officer's determination that Portis's Total Offense Level is 12 for Count 1 and that Portis's Criminal History Category is I. [Presentence Investigative Report ("PSR") ¶¶ 34-56.] Portis's applicable Guideline range is therefore 10-16 months. [*Id.* ¶ 86.] Pursuant to the factors contained in 18 U.S.C. § 3553(a) and for the reasons set forth below, the United States believes that a sentence at the high end of the Guidelines range is appropriate.

**I.**     **Background**

     **A. Charges Against Portis and the Disposition of those Charges**

On December 5, 2019, a grand jury sitting in the Eastern District of Kentucky returned a nineteen-count Indictment, charging Portis and seven others with conspiracy to

commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and health care fraud, in violation of 18 U.S.C. § 1347. [PSR ¶¶ 1-6; R. 1: Indictment.]   In the weeks and months that followed, five of Portis's co-conspirators pleaded guilty to Count 1 of the Indictment: conspiracy to commit health care fraud.   [R. 78: Etric Pruitt Plea Agreement; R. 88: Ceandris Brown Plea Agreement; R. 125: James Butler Plea Agreement; R. 152: John Eubanks Plea Agreement; R. 173: Fredrick Bennett Plea Agreement.]

On July 23, 2020, a grand jury sitting in the Eastern District of Kentucky returned a Superseding Indictment, charging Portis and five others with conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, and health care fraud, in violation of 18 U.S.C. § 1347.   The Superseding Indictment also charged one of Portis's co-conspirators, Robert McCune ("McCune"), with three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A [R. 156: Superseding Indictment.]   In the weeks that followed, three of Portis's co-conspirators pleaded guilty to Count 1 of the Superseding Indictment: conspiracy to commit health care fraud.   [R. 273: Anthony Montgomery Plea Agreement; R. 279: Darrell Reid Plea Agreement; R. 281: Antwan Odom Plea Agreement.]

On August 23, 2021, a jury trial commenced against Portis, McCune and a third co-conspirator, Tamarick Vanover ("Vanover").   On the first day of trial, McCune pleaded guilty to all charges against him in the Superseding Indictment.   [R. 426: Minute Entry

for Rearraignment of McCune.] During trial, Portis testified and stated on several occasions that he did not believe he had done anything wrong. [*See, e.g.*, R. 464: Trial Day 5 Tr. at 154:17-24, 168:4-6.] After an eight-day trial, the jury returned a verdict of guilty as to three of five counts against Vanover. [R. 444: Verdict Form as to Vanover.] The jury was unable to reach a unanimous verdict on the two remaining counts against Vanover, nor was the jury able to reach a unanimous verdict on any of the three counts against Portis. [R. 444, 445: Verdict Forms as to Vanover and Portis.]

On September 1, 2021, immediately after the jury was dismissed, the Court conducted an *ex parte* hearing with a juror. After the Court informed the parties of the content of that hearing, counsel for Defendant Vanover moved for a mistrial on the counts of conviction, and the United States did not oppose. The Court declared a mistrial on those counts of conviction and set a pretrial conference for the next day to schedule a retrial. [R. 441: Minute Entry for Trial Day 8.]

On September 2, 2021, the Court set the retrial of Portis and Vanover to commence the following Tuesday, September 7, 2021. [R. 448: Minute Entry for Pretrial Conference.]

On September 3, 2021, Portis pleaded guilty to Count 1 of the Superseding Indictment: conspiracy to commit health care fraud. [R. 452: Portis Plea Agreement.] Vanover Pleaded guilty to the same Count later the same day. [R. 454: Vanover Plea Agreement.] Pursuant to plea agreements, the United States has agreed to move to

3

dismiss the remaining Counts against Portis and Vanover.   [R. 452, 454: Plea Agreements ¶ 17.]

## B. Portis's Personal Characteristics and Offense Conduct

### 1. Portis's Football Career and Financial Situation after Retirement

Portis played in the National Football League ("NFL") for nine seasons.   During that time, Portis was paid approximately $43 million and achieved considerable fame, particularly during his time with the Washington Football Team, which selected him as one of the team's 80 best players of all time.   [PSR ¶¶ 78-79; Mike Richman, *Redskins Legacy: Portis One of 80 Greatest*, WASHINGTONFOOTBALL.COM (Oct. 25, 2013), *available at* https://www.washingtonfootball.com/news/redskins-legacy-portis-one-of-80-greatest-11634470.]

After his career in football ended, Portis encountered financial difficulties and ultimately declared bankruptcy.   According to a December 16, 2015 bankruptcy court filing signed by Portis, he had amassed over $450,000 in debts to just two casinos (the Borgata in Atlantic City, NJ, and the MGM Grand Casino in Las Vegas, NV), as well over $400,000 in non-dischargeable, domestic support obligations – among many other debts. [*See* Ex. A, Government Exhibit ("GX-") 745.][1]   Portis's bankruptcy proceedings resulted in his dischargeable debts being discharged in July 2016.   [*See* Ex. B, GX-746.]

---

[1] All exhibits referenced in this Sentencing Memorandum were admitted at trial.   The United States has attached copies hereto for the convenience of the Court.

After his bankruptcy, Portis held various professional positions and again began making substantial sums of money. Among other jobs, Portis served as a broadcaster for the Washington Football Team from 2016 through 2019 – a position that paid him $120,000 per year. [PSR ¶ 78.] In addition, Portis earned money from other endeavors. Bank records show that, from January 1, 2017 through December 31, 2017 alone, Portis made over $350,000 in cash deposits into an account he controlled in the name of his company, 2 Six LLC. [*See* Ex. C, GX-724 at UpshawHRA_00014561.]

During this time period, however, Portis's spending habits kept pace with his earnings. Bank records show that, during the same period when the approximately $350,000 in cash was deposited into the account mentioned above, approximately $362,000 in cash was withdrawn. [*Id.*] Bank records further show that, by early 2018, Portis had close to a zero balance across all his bank accounts. [*See* Ex. D, GX-817.]

In addition, Portis's non-dischargeable debt obligations also continued to grow. For example, a September 18, 2017 court order showed that he was $68,250 in arrears on a recurring debt obligation of $3,000 per month. [Ex. E, GX-752 at UpshawHRA_00125718.]

Finally, during that same time period, Portis gambled heavily. Evidence admitted at trial shows that, from January 1, 2017 and December 31, 2017, Portis put in nearly $1 million at just five casinos. [Ex. F, GX-822.]

5

### 2. Portis's Benefits Under the Gene Upshaw NFL Player Health Reimbursement Account Plan

Portis's relatively lengthy NFL career (greater than three seasons) qualified him to be a Participant in the Gene Upshaw NFL Player Health Reimbursement Account Plan ("the Plan"), a health care benefit program established pursuant to the 2006 Collective Bargaining Agreement between the NFL Management Council and NFL Players Association. The Plan was established to assist certain former NFL players and their families pay for health care costs after the player's retirement. The Plan reimburses its Participants, their spouses and dependents for out-of-pocket medical care expenses up to a maximum of $350,000. The Plan is funded solely through contributions by the NFL teams, not the players, and any benefits remaining at the time of a former player's death would pass to his spouse and other dependents. [PSR ¶¶ 7-9.]

The Plan was set up such that Participants were not taxed when benefits became available to them under the Plan, nor were they taxed on reimbursements, so long as the reimbursements were for actual Medical Care Expenses incurred by the Participants or their families. If the Plan allowed reimbursements to Participants for expenses other than Medical Care Expenses, for example, cash payments not associated with any Medical Care Expenses, the Plan could lose its tax-favored treatment, and Participants in the Plan could be subject to taxation on their reimbursements. [*Id.* ¶ 11.]

The NFL Player Benefit Office provided all Participants with a Summary Plan Description ("SPD"), which, among other things, summarized the Plan, including the

purpose of the Plan, what items or services were covered by the Plan, and how to submit claims to the Plan.  [*Id.* ¶ 13.]

### 3. Portis's Fraud on the Gene Upshaw NFL Player Health Reimbursement Account Plan

Between December 2017 and December 2018, Portis conspired with McCune and others to defraud the Plan by submitting or causing the submission of false and fraudulent claims that sought reimbursements for expensive medical equipment that was never actually purchased or received.  [PSR ¶ 29.]  The false and fraudulent claims included falsified prescriptions, falsified letters of medical necessity, and falsified invoices.  [*Id.*]  Portis and his coconspirators submitted more than $2.8 million in false and fraudulent claims to the Plan, causing the Plan to pay out more than $2.5 million on those false and fraudulent claims.  [*Id.* ¶ 27.]

With regard to Portis's specific role in the overall conspiracy, he agreed with McCune to submit two false and fraudulent claims to the Plan under his (Portis's) name. Portis knew the claims McCune submitted on his behalf were false and fraudulent or was aware of a high probability that the claims McCune submitted on his behalf were false and fraudulent and deliberately ignored that fact.  [*Id.* ¶ 29.]

The first false and fraudulent claim, submitted on or around January 2, 2018, was for a hyperbaric oxygen chamber and gurney.  [*Id.* ¶ 30; Ex. G, GX-108 at UpshawHRA_00066496.]  The second false and fraudulent claim, submitted on or around March 8, 2018, was for a cryosauna and sculpting cryo lipolysis.  [*Id.* ¶ 30; Ex. H, GX-7

at UpshawHRA_00001893.] The items were not medically necessary and were not actually purchased or delivered. As a result of these two false and fraudulent claims, the Plan paid Portis $99,264. [*Id.* ¶ 30.]

In exchange for the submission of these false and fraudulent claims, Portis paid kickbacks and bribes to McCune totaling $13,500 shortly after Portis received each of his checks from the Plan's Benefits Administrator, CIGNA Healthcare ("CIGNA"). [*Id.* ¶ 29; Trial Day 5 Tr. at 214:9-14; Ex. I, GX-814 (1/18/2018 Deposit of $4,000 from Portis; 3/27/2018 Deposit of $8,000 from Portis); Ex. J, GX-703c (2/26/2018 Deposit of $1,500 from Aji Eapen).] On or about January 18, 2018 (two days after Portis deposited his first check from CIGNA), Portis wired McCune $4,000, and on March 27, 2018 (eight days after Portis deposited his second check from CIGNA), Portis wired McCune $8,000. [*See* Ex. I, GX-814.] In addition, Portis testified that he instructed his friend, Aji Eapen, to deposit $1,500 into McCune's account on Portis's behalf between the submission of Portis's first and second false and fraudulent claims. [Trial Day 5 Tr. at 206:16-207:20; Ex. J, GX-703c.]

In addition, shortly after depositing each of his checks from CIGNA, Portis used a portion of those ill-gotten funds to go gambling. The day after he deposited his first check, he put in $10,000 at the MGM Grand National Harbor, MD, and took out nothing. [Ex. K, GX-823.] And, in the 3.5 weeks following Portis's deposit of his second check from

8

CIGNA, Portis put in $55,000 at two casinos and took out only $27,400. [Ex. L, GX-824.]

After the fraud was uncovered later in 2018, Portis was contacted by investigators from CIGNA, who called Portis's cell phone on various occasions. [Ex. M, GX-170: CIGNA Case Log for Atlanta Hyperbaric Center (6/15/2018 & 10/24/2018 entries).] CIGNA also requested repayment of the ill-gotten gains by letter. [Ex. N, GX-153: Damages Letter to Portis.] Portis avoided the calls from CIGNA's investigators and never attempted to repay the Plan. [Ex. M, GX-170: CIGNA Case Log for Atlanta Hyperbaric Center (6/15/2018 entry showing that Portis answered a call to his cell phone by a CIGNA investigator but ended the conversation by stating that he was boarding a plane; 10/24/2018 entry showing CIGNA investigator leaving a voicemail for Portis on his cell phone).]

In 2019, Portis was approached by FBI agents, but he did not make any statements to them.

At trial in August 2021, Portis testified and denied committing fraud or doing anything wrong. [*See, e.g.*, R. 464: Trial Day 5 Tr. at 154:17-24, 168:4-6.] Portis instead stated that he believed it was proper to pay McCune $13,500 to help Portis get nearly $100,000 from the Plan. [*See id.* at 214:9-14; 218:18-24.]

Only after sitting through an entire trial – and with a retrial looming the following week – did Portis admit that he knowingly and willfully conspired with McCune and others

9

to defraud the Plan. Portis accordingly pleaded guilty to Count 1 of the Superseding Indictment. [PSR ¶ 3; R. 452: Portis Plea Agreement.]

Finally, only with sentencing looming has Portis repaid the Plan. The United States understands that, on December 20, 2021, Portis wired the Plan the $99,264 to repay the Plan for the two false and fraudulent claims submitted on his behalf.

## II.  Argument

Courts "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 Fed. Appx. 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). The Guidelines range is advisory and serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Next, the Court must considers the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; the need to afford adequate deterrence; the need the need to avoid unwarranted sentencing disparities; and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### A.  The PSR Accurately Calculates the Applicable Guidelines Range.

Neither the United States nor Portis have any objections to the PSR. The PSR calculates Portis's Total Offense Level as 12. This calculation includes: (a) a base offense

level of 6; (b) an 8-level enhancement for losses of more than $95,000 but less than $150,000; and (c) a two-level adjustment for acceptance of responsibility. [PSR ¶¶ 35-43.] Portis's criminal history category is I. [Id. ¶ 56.] Portis's resulting advisory guideline range is 10-16 months. [Id. ¶ 86.]

**B. The Sentencing Factors of Section 3553(a) Support a Custodial Sentence at the High End of the Guidelines Range.**

The sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence at the high end of the Guidelines range.

*1. Nature and Circumstances of the Offense*

Portis committed an intentional and significant fraud on a health care plan that was established specifically to help his fellow retired NFL players and their families pay for out-of-pocket health care costs. Indeed, Portis's actions – causing the submission of false and fraudulent claims solely to receive illicit cash payments unrelated to any health care expense – threatened the Plan's tax-favored status and could have resulted in significant tax bills for all other Participants and their families who were using the Plan correctly.

Health care fraud like that committed by Portis contributes greatly to the inflated cost of health care in this country. It is incumbent upon the Court to send a strong, clear message to the public that such a violation of the trust health care plans place in those they seek to help cannot and will not be tolerated. In this case, such a message is all the more required given Portis's brazen fraud and failure to take any action to lessen its effects, despite numerous opportunities to do so.

11

Portis's knew that his conduct was wrong. Portis paid McCune $13,500 in kickbacks and bribes to defraud the Plan of nearly $100,000. *See supra* at 8. In addition, Portis called the Plan Office on the very day his second false and fraudulent claim was submitted. Instead of inquiring about claims submission, Portis simply asked how much was left in his Plan account. [GX-218 (Recording of Call from Portis to Plan Office on 3/8/2018).]

Later, after Portis had been paid approximately $100,000 by the Plan in exchange for the false and fraudulent claims submitted on his behalf – but before Portis's fraud was uncovered – Portis was alerted via text message from a co-conspirator that another player had been charged with defrauding the Plan in a way similar to that which Portis had defrauded the Plan. Portis simply responded "Damn." In that same text chain, Portis was asked, "What u think," and Portis responded, "Stay out the way." Immediately thereafter, Portis was asked: "U talk to rob," to which Portis responded: "Nope" and "Send it to him." [Ex. O, GX-421a at UpshawHRA_0011884951.]

Once the fraud was uncovered, Portis had numerous opportunities to admit his illegal conduct, accept responsibility, and take measures to remedy his wrongs. Portis repeatedly failed to do so. When approached by investigators from CIGNA, the Plan's benefits administrator, Portis avoided them. *See supra* at 9. Portis did not talk to FBI agents when they contacted him. And even when testifying at trial, Portis refused to admit that he committed fraud or accept responsibility. *See supra* at 3.

12

Only after sitting through trial and confronted with a retrial the next week did Portis admit that he knowingly and willfully conspired with McCune and others to defraud the Plan. [PSR ¶ 3; R. 452: Portis Plea Agreement.] And only with sentencing looming did Portis repay the Plan the amount he was paid as a result of his fraud. *See supra* at 10.

The nature and circumstances of Portis's crime therefore warrant a sentence at the high end of the Guidelines range.

2. *History and Characteristics of the Defendant*

Portis, age 40, comes before the Court as an individual who has achieved great fame and fortune. *See supra* at 4. Although he declared bankruptcy following his long and successful NFL career, Portis began earning substantial sums of money soon after the bankruptcy was discharged. In addition, Portis deposited large sums of money into his accounts in the year immediately preceding the submission of his first false and fraudulent claim. *See supra* at 5. However, Portis continued spending that money as it came in, and he continued to amass substantial debts, leaving him close to a zero balance across all his bank accounts immediately before the first false and fraudulent claim was submitted on his behalf. *See supra* at 5.

Portis has no significant criminal history. [PSR ¶¶ 45-65.] He reports that he has had some injuries due to his long career in the NFL, but he has been able to work in lucrative positions since his retirement. [*Id.* ¶¶ 71-79.] Indeed, the record lacks any evidence of severe mental, emotional or substance abuse issues, or any other reason to

13

explain why Portis would commit the crimes he did – other than a desire for financial gain and to feed his gambling habit.

       3.     *Seriousness of the Offense, Promote Respect for the Law; Provide Just Punishment*

A sentence at the high end of the Guidelines range takes into account the seriousness of the offense, promotes respect for the law and provides a just sentence. Portis committed a very serious crime – one that involved brazen fabrications and threatened the tax-favored status of the Plan. If the Plan had lost such tax-favored status, other law-abiding Participants and their families could have been significantly harmed through the need to pay significant tax bills. In addition, Portis's conduct endangered the availability of health care benefits that also inure to the benefit of Portis's numerous dependents.

       4.     *Need to Deter Future Criminal Conduct*

Section 3553(a)(2)(C) considers both specific deterrence as to the defendant and general deterrence as to the public. The United States assumes that Portis will not defraud the Plan again once he is released from any term of imprisonment. But a sentence at the high end of the Guidelines range is important to send a message to all other potential health care fraudsters.

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations

14

omitted). Accordingly, general deterrence is a "crucial factor in sentencing decisions for economic . . . crimes." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015); *see also* S. REP. 98-225, at 76 (legislative history of § 3553 notes that deterrence is "particularly important in the area of white collar crime").

This is especially true in health care fraud cases like the present. Health care fraud plagues this country and increases the cost of health care for everyone. The health care system in this country relies upon honesty. A significant sentence of imprisonment will help ensure that others know that fraud will result in more than a repayment order or fine, but rather will result in a meaningful prison term.

5. *Need to Protect Public from Defendant's Future Criminal Conduct*

It seems probable that a sentence at the high end of the Guidelines range will adequately protect the public from Portis's future criminal behavior.

6. *Need to Provide Treatment to Defendant*

Portis does not report any need for substance abuse or mental health treatment and, as such, this factor does not bear on the appropriate sentence under § 3553(a).

7. *Need to Avoid Unwarranted Disparities*

Portis's crime does not fall outside the heartland of criminal offenses, and a sentence at the high end of the Guidelines range will ensure that no unwarranted disparity exists between his sentence and the sentence of a like-positioned defendant.

To date, eight other defendants who had false and fraudulent claims submitted to the Plan on their behalf – but who did not recruit other players and who were not orchestrators of the overall conspiracy – have been sentenced by this Court:

(1) the Court sentenced Ceandris Brown to a year and a day (high end of the Guidelines range), after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (both of which were paid);

(2) the Court sentenced Etric Pruitt to three months' imprisonment followed by 180 days' home confinement (within the Guidelines range), after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (both of which were paid);

(3) the Court sentenced James Butler to two months' imprisonment followed by 180 days' home confinement (within Guidelines range), after he pleaded guilty to causing the submission of three false and fraudulent claims to the Plan on his behalf (all of which were paid);

(4) the Court sentenced Anthony Montgomery to time served, after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (only one of which was paid);

(5) the Court sentenced Joe Horn to time served, after he pleaded guilty to causing the submission of multiple false and fraudulent claims to the Plan on his behalf (many of which were paid);

(6) the Court sentenced Fredrick Bennett to time served, after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (only one of which was paid);

(7) the Court sentenced Antwan Odom to time served, after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (only one of which was paid); and

(8) the Court sentenced Darrell Reid to time served, after he pleaded guilty to causing the submission of two false and fraudulent claims to the Plan on his behalf (only one of which was paid).

*See* R. 131, 506, 511, 533, 534, 535, 536; *United States v. Horn*, No. 5:19-cr-00210-KKC (R. 52.)[2]

Although Portis's underlying offense conduct was similar to all these defendants', as they all caused multiple false and fraudulent claims to be submitted to the Plan on their own behalf, the United States believes that Portis is most similarly situated to Defendant Brown, who received a sentence at the high end of the Guidelines range. Both Portis and Brown had multiple opportunities to accept responsibility early but failed to do so. *See supra* at 9; R. 126: U.S. Sentencing Mem. for Ceandris Brown. Indeed, Portis waited to accept responsibility until after a mistrial and with a retrial looming just days later. *See supra* at 9-10. In addition, both Portis and Brown had multiple opportunities to assist the

---

[2] Three other defendants have been sentenced by this Court, but they are not similarly situated, as they had different roles in the scheme. Both Carlos Rogers and John Eubanks were recruiters who facilitated the submission of false claims to the Plan on behalf of other former NFL players in exchange for a fee of a few thousand dollars each. The Court sentenced Rogers to time served and 180 days of home detention (below Guidelines range), after he pleaded guilty to receiving $6,500 for helping facilitate the submission of four false claims on behalf of other players; and the Court sentenced Eubanks to 18 months' imprisonment (slightly below Guidelines range), after he pleaded guilty to receiving $22,282 for helping facilitate the submission of 10 false claims on behalf of other players. *See* R. 505: Judgment re: John Eubanks; *United States v. Rogers*, No. 5:19-cr-00205-KKC (R. 88). Finally, Correll Buckhalter was an orchestrator of a separate but similar scheme, and he had multiple claims submitted on his behalf in the present scheme, all of which were paid. The Court sentenced Correll Buckhalter to ten months' imprisonment (well below Guidelines range), but only after a significant 5K motion was granted, and Buckhalter's significant attempts to ameliorate the harm to the Plan were taken into consideration. *See United States v. Buckhalter*, No. 5:19-cr-00205-KKC (R. 112).

United States but failed or refused to do so. *See supra* at 9-10; R. 126: U.S. Sentencing Mem. for Ceandris Brown.

The other defendants, on the other hand, accepted responsibility to a greater degree, did so earlier, proffered with the United States, and/or otherwise assisted the United States in the prosecution of co-conspirators to a far greater degree than Portis and Brown – indeed Defendants Butler and Horn testified at trial. Therefore, a sentence at the high end of the Guidelines range – similar to that which was imposed on Defendant Brown – is appropriate for Portis.

### C. The Court Should Also Impose a Fine

In addition to a custodial sentence and mandatory restitution, the United States also respectfully asks the Court to impose a fine. In fraud cases like the present, where financial gain is often the primary motive, a fine conveys the seriousness of the offense, promotes respect for the law, and provides further deterrence. *See United States v. Breeding*, 109 F.3d 308, 311 (6th Cir. 1997) ("higher fines, and longer sentences of imprisonment, are more effective deterrents"). In this case, the United States suggests that a fine at the midpoint of the Guidelines range is appropriate.

### III. Conclusion

For the reasons stated above, the United States submits that a sentence at the high end of the Guidelines range is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

/s/ Andrew E. Smith
Andrew E. Smith
Assistant United States Attorney
260 W. Vine St., Suite 300
Lexington, KY 40507
Tel: (859) 685-4849
Andrew.e.smith@usdoj.gov


JOSEPH S. BEEMSTERBOER, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

/s/ John ("Fritz") Scanlon
John ("Fritz") Scanlon
Assistant Chief
Alexander J. Kramer
Trial Attorney
U.S. Department of Justice, Criminal Division
1400 New York Avenue NW
Washington, DC 20530
Tel: (202) 304-2946 (Fritz Scanlon)
Tel: (202) 768-1919 (Alexander Kramer)
john.scanlon@usdoj.gov
alexander.kramer@usdoj.gov

## CERTIFICATE OF SERVICE

On December 30, 2021, I electronically filed this motion through the ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ John (Fritz) Scanlon
Assistant Chief
U.S. Department of Justice, Criminal Division